**DIGNAN, Plaintiff v BRANDON OIL CO., Defendant.**
(Two cases)

Ohio Appeals, 7th District, Mahoning County.

Decided October 9th, 1931.

**104**

David E. Jones, Youngstown, for plaintiff.
D. W. Mumaw, Youngstown, and Fred Heim, Youngstown, for defendant.

## OPINION

By POLLOCK, J.

The defendant in error brought an action in the Court of Common Pleas against the plaintiffs in error to recover $9,138.87, for merchandise furnished, and being the balance it claims due on that contract. The petition is in the short form for an action on an account. There were separate answers filed by these two defendants, each defendant denying the allegations of the petition. The cases were tried in the court below, resulting in a verdict in favor of the plaintiff below for the full amount claimed. These two actions, though separately filed, were prosecuted by the defendants to reverse that judgment. We will refer to these parties as they appeared in the court below, plaintiff and defendant.

The error complained of is that the court in his charge to the jury submitted the issue whether the two defendants were partners. We might say that the real controversy that we are now considering in the case is in regard to Sara A. Dignan. The court charged that if they were partners, that whether it was a secret partnership or not, she would be liable, and closed the charge on the partnership as follows:

"If you find that there was a partnership between M. J. Dignan and Miss Sara A. Dignan at the time that these products that are

sued for were delivered, then Miss Sara A. Dignan would be liable, and that would be true regardless of what she may have said at any time as to her being liable or not being liable."

This is correct if there was a partnership in fact. The charge itself as to partnership is not the question in this case. The question is whether there was any evidence in this case or sufficient evidence tending to prove that there was a partnership to authorize the court to charge the rule of partnership.

It appears from the facts in this case that in May of 1926, Martin J. Dignan was operating six, what is commonly known as filling stations. selling gasoline and other products that are used in the operation of automobiles. He had possibly six stations in the City of Youngstown and one in the City of Ashtabula, and had certain parties in each one of the stations who were managing it for him. On the 15th day of May of that year, Martin J. Dignan entered into an agreement with the Brandon Oil Company by which the company was to furnish the gasoline and he was to purchase from them all of the gasoline used at these several stations and the other products used in operating automobiles. The parties entered into the performance of this contract. One of these stations was at the corner of Market and Pasadena Avenues in this city, and that is the one that is involved in this law suit.

At the time this contract was made between M. J. Dignan and the Oil Company, a man by the name of Stadiford, if I have the name correct, was operating this gasoline station and continued to do so until about August, probably the 15th, of that year, when he quit operating this station and Mr. Dignan took charge of it himself. It is hard to determine from the evidence the exact dates of any change in the management of the station, but anyway it went on until some time in the late summer or fall, when the Oil Company became dissatisfied with the manner in which M. J. Dignan was complying with the provisions of the contract in regard to paying for the products he was using at this station. Possibly we should have said that under this contract the man operating each one of these stations was expected to pay for the products as they were delivered by the truck drivers of the Brandon Oil Company. Evidently Dignan was not keeping the payments up, and about the time stated he gave a check on a bank in Asbtabula which was not paid on account of no funds. He was notified of this fact and at that time Sara A. Dignan comes into this transaction, so far as we can learn from this record. After talking to M. J. Dignan about this check, for some reason Mr. Brandon, the President of the Oil Company, called upon Sara A. Dignan. Sara A. Dignan was an aunt of M. J. Dignan, and was engaged, and had been for many years in some kind of retail store, groceries and probably other commodities, in this city. Now, Brandon testifies:

"I said, 'Sara, we are having trouble with Marty. You may not know but the account is around $1400.00, entirely too high and much above his commissions. Now, Marty's checks are coming back on us, and he is giving checks that are no good, even on out of town banks, and he is lying to us and we can't believe him.' I said 'Now, we have gone as far as we will with Marty, and can't go any farther. Marty has given us to understand you are partners, but you have never told us, but I want a show down. Who is going to pay? Your credit is good but Marty's is not, and we will charge no more to him. If we can charge the account to you and you be responsible and you pay it, we will deliver the gasoline. Otherwise we will deliver no more to Marty.' Miss Dignan said, 'All right, go right ahead and make deliveries as you have been, have the boys sign, and bring the slips over to my store and I will pay for them.' And that system was put into effect within a few days, or at once, I am not just sure."

From that time on, or starting about that time, the drivers would get checks of the delivery and take them to Miss Dignan's store and she would pay them. M. J. Dignan was taking the money received at this station and delivering it to Miss Dignan. About the same time there was endorsed on this contract, in the handwriting of the President of the Oil Company, "All checks and remittances are to be made to Sara A. Dignan", and this was signed by M. J. Dignan. This continued until well on in the fall some time, when the Oil Company concluded that the operators of their trucks were spending too much time in getting these payments for the gasoline delivered at the Market Street station. There is testimony that Miss Dignan was engaged in her own business in this store and that the operators of the trucks would have to wait sometimes for quite a period in order that she would have time to pay them for the amount of gasoline delivered on that trip. It was then proposed by the Oil Company in a telephone conversation with Sara A. Dignan, that her credit was good and the operators of the trucks would not come for pay, but that the Oil Company would send statements and she could pay by check. This was adopted and from that time on the Oil Company commenced to charge without, so far as we can find from the record, any further direction to do so, the oil for this station to both Sara A. Dignan and M. J. Dignan, and this continued until about the 15th of February with no further complaint and trouble. At that time M. J. Dignan employed persons, denominated in the record as the Nutt boys, to operate this station. The oil and gasoline furnished M. J. Dignan prior to that time was entirely paid for. These Nutt boys proceeded to operate this station. From the record we presume that they paid for their products that they got from this Oil Company, just as the other oil stations did, until about the middle of April when they ceased to operate this station at Market and Pasadena. M. J. Dignan went

back and continued, himself, to operate this station until the close of the contract, or at least until the Oil Cmpany quit furnishing any further oil, which was on August 27th, 1928. At that time the claim was made by the Oil Company that M. J. and Sara A. Dignan were indebted in the amount in suit.

The first conversation we have referred to between Mr. Brandon and Miss Dignan, occurred while M. J. Dignan was operating this station the first time, before the Nutt boys commenced to operate it. After he commenced to operate the station a second time there was this further conversation, Mr. Brandon referring to Marty. as he called him, telling Miss Dignan something about what kind of a man he thought he was. The following conversation is claimed to have occurred, and is testified to by Mr. Brandon:

"But as we were leaving Miss Dignan said: 'By the way, I notice that you have my name on those invoices. Now, that don't mean a thing.' I said, 'Miss Dignan, your name is the only name that means anything to us. We had that out long ago; that is, we are charging you and you have been doing the paying. When there comes a time you don't pay, we don't deliver any more gasoline. Now that matter is up, we might as well have it out. Are we to look to you, or are we not? If we charge it to you we will deliver, and not to Marty'. She didn't contest it. She said 'Go ahead and make deliveries and you will get your money.' I said, 'All right, we will make deliveries to you and you will pay', and we left and that's the only time she ever said anything to me, at least."

There is some other testimony by Mr. Brandon, or some one connected with him, that Miss Dignan had been to their place and inquired something about this business, and there are other conversations about the pay for the gasoline, a number of notes were given, but we have referred to the substance of the conversation between the Oil Company, or its President, and Miss Dignan in regard to her relation to this contract It must be conceded that the contract was at first between the Oil Company and M. J. Dignan. Miss Dignan denies these conversations, as testified to by Mr. Brandon, the President of the Oil Company. She denies that she is a partner. in fact denies that she had any interest in the contract, that she undertook the business of looking after the payment to help her nephew and to keep him going, probably, in his oil station. M. J. Dignan denies that he ever told the Brandon Oil Company, or anyone else, that he and his aunt were partners, and they both deny that they were partners. From this evidence— we do not mean to say it is all of the evidence of conversations between these parties, but it is the substance, and we think sets out the relationship that appears from this record—the only time that

108

Mr. Brandon challenged Miss Dignan about being a partner is when he claims that he told her that Marty, as he called him, had told him that she was. She did not make any direct denial of the partnership, but she did make her answer and the further conversation between them related not to a partnership but to whether she would be responsible for the products which they were selling to this gasoline station, and from Mr. Brandon's evidence that was what he was trying to find out, whether she would be responsible for the gasoline delivered to this station which M. J. Dignan was then actively operating.

In order to be a partnership and justify the charge that this court gave to the jury, that they could find from this evidence that there was a partnership, there must be the actual relation existing between these two parties of a partnership. It was not necessary, of course, that they should testify that they were partners, express evidence, but it is a question whether there were sufficient circumstances and conditions surrounding this evidence that gave the trial court the right to charge the jury as to a partnership. If they were partners it did not make any difference what this woman knew about it or did not know. She was liable as M. J. Dignan was liable. The court just before giving this charge had said to the jury, in substance, that there was no issue as far as M. J. Dignan was concerned in this case, except the amount that was due.

In order to be a partnership there must usually be a division of the profits between the partners, and there also �in must be some authority so that the act of one will bind the other. The Supreme Court has said in **Harvey v Childs and Potter, 28 Oh St 319:**

"Participation in the profits of a business, the cogent evidence of a partnership, is not necessarily decisive of the question. The evidence must show that the person taking the profits shared them as principals in a joint business in which each has an express or implied authority to bind the other."

There is no evidence here that they shared in the profits. Probably there were no profits, but M. J. Dignan took what he could get, and in all of this evidence which Mr. Brandon gives there is only one expression that M. J. Dignan had told him that they were partners. The balance of these conversations looked to the other question in this case, did this woman direct the Oil Company, when she knew they would not deliver these products to M. J. Dignan, to go on and deliver them and she would pay for them. The further charge of the Court in this case is upon that proposition.

We have gone through the record the best we could and think that from this evidence produced by the defendant that there were

not sufficient facts or circumstances proven that would warrant the court in giving the charge that the jury could find from this evidence that they were partners, or that they might believe from this evidence that they were partners, and the charge ▆▆▆▆▆ that they were partners was the prominent · issue given to the jury in this case. We think that it was not only error but was very prejudicial.

There were other errors urged in this case in the admission and rejection of evidence and so forth, but as there was no exception saved to them we have not considered them, and of course express no opinion about them.

The judgment is reversed for error in the charge.

Judgment reversed.

ROBERTS and FARR, JJ., concur in the judgment.